Bui v. Phan, 2026 NCBC 3.

STATE OF NORTH CAROLINA

MECKLENBURG COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
24CV001348-590

THAO PHUONG BUI,

        Plaintiff,

v.

KHANH NGOC PHAN and GOLDEN
ROOSTER, LLC,

        Defendants.

**FINDINGS OF FACT, CONCLUSIONS
OF LAW, AND JUDGMENT
FOLLOWING BENCH TRIAL**

1.      This case arises out of a dispute between Golden Rooster, LLC's members—Plaintiff Thao Phuong Bui and Defendant Khanh Ngoc Phan. In September 2025, the Court held a bench trial on Bui's claims for breach of contract and declaratory judgment. Having considered all relevant evidence, the Court enters the following findings of fact, conclusions of law, and judgment.

> *Vilmer Caudill, PLLC by Bo Caudill, Megan Cobb, and Nicholas Williams, for Plaintiff Thao Phuong Bui.*
>
> *Raynor Law Firm PLLC, by Kenneth Raynor, for Defendant Khanh Ngoc Phan.*
>
> *No counsel appeared for Nominal Defendant Golden Rooster, LLC.[1]*

Conrad, Judge.

---

[1] Golden Rooster is a nominal defendant for purposes of Bui's claims and is not represented by counsel.

# I.
## FINDINGS OF FACT[2]

2.      Bui and Phan are erstwhile romantic partners.  Their relationship, which goes back nearly twenty years, ended in February 2023 when Bui discovered that Phan had been unfaithful.

3.      Golden Rooster, LLC is a North Carolina limited liability company formed in early 2019.  (Tr. Ex. 1; Stip. ¶ (c).)

4.      Bui and Phan are Golden Rooster's only members, each owning a fifty-percent interest.  (Stip. ¶ (f).)

5.      About a year after forming Golden Rooster, Bui and Phan executed an operating agreement to govern its operations.  The agreement is valid, as stipulated by the parties.  Bui and Phan did not consult a lawyer in connection with making the agreement; rather, Phan created it using a template that she found online.  (*See* Tr. Ex. 2 ["Op. Agrmt."]; Stip. ¶¶ (d), (e).)

6.      Golden Rooster's purpose, as stated (somewhat ungrammatically) in the operating agreement, is "[r]eal estate purchase, sell, and rentals."  (Op. Agrmt. ¶ 3; *see also* Stip. ¶ (h).)

---

[2] The trial record includes the testimony of Bui and Phan, who were the only witnesses, and more than thirty exhibits.  The record also includes the parties' stipulations of fact, which appear in the first section of the final pretrial order.  (*See* ECF No. 110 ["Stip."].)  In general, the Court finds the documentary evidence far more compelling than the witness testimony.  Bui and Phan are interested parties, and neither's testimony, standing alone, was more credible than the other's.

7. The company's management "is vested in the Members," and Bui and Phan have equal managerial authority and equal voting power for matters requiring a member or manager vote. (Op. Agrmt. ¶¶ 17, 23; Stip ¶ (g).)

8. The operating agreement values the members' capital contributions equally, promises that each "will receive an equal share of any Distribution," and grants each the same right to inspect company records. (Op. Agrmt. ¶¶ 6, 8, 45.)

9. The operating agreement also states that neither member "may do any act in contravention of" its terms; confer "express, implied or apparent authority" on a nonmember; "make it impossible to carry on the ordinary business of the Company"; "bind or obligate the Company to any extent with regard to any matter outside the intended purpose of the Company"; or "confess a judgment against the Company." A "violation" of these "forbidden acts will be deemed an Involuntary Withdrawal" from membership. (Op. Agrmt. ¶¶ 55–60.)

10. A separate provision deals with expulsion from membership. The operating agreement states that either member may seek to expel the other when "it has been judicially determined" that the to-be-expelled member "engaged in wrongful conduct that adversely and materially affected the Company's business"; "willfully or persistently committed a material breach of" the agreement "or of a duty owed to the Company or the other Members"; or "engaged in conduct relating to the Company's business that makes it not reasonably practicable to carry on the business with the Member." (Op. Agrmt. ¶ 29.)

11. There is also a limitation-of-liability clause, which states that a member "will be liable only for any and all acts and omissions involving intentional wrongdoing." In no event is a member "liable to the Company or to any other Member for any mistake or error in judgment or for any act or omission believed in good faith to be within the scope of authority conferred or implied by" the operating agreement. (Op. Agrmt. ¶ 62.)

12. When Bui and Phan ended their romantic relationship in February 2023, they decided to end their business relationship as well. At that time, Golden Rooster owned three rental properties. Bui favored liquidating all three properties and splitting the proceeds; Phan favored retaining the properties and buying Bui's membership interest. (*See* Tr. Ex. 37.)

13. Over a span of several weeks in February and March 2023, Bui withdrew more than $300,000 from Golden Rooster's accounts with Phan's consent. (Tr. Ex. 38.)

14. In April 2023, Phan withdrew $7,000 from Golden Rooster's account with Fifth Third Bank. (Tr. Ex. 28.)

15. The parties dispute whether Bui knew about and gave consent to the April 2023 withdrawal. The Court finds that she did. Three facts support Phan's recollection on this point. First, Bui and Phan commonly discussed distributions and other financial transfers orally without documenting their agreements. Second, Phan paid $142,000 *into* the Fifth Third account just a few weeks before the $7,000 withdrawal, significantly weakening any inference of nefarious intent. Third,

although Bui lost online access to Golden Rooster's accounts after the breakup, she represented to Phan that she "was able to get the info [she] needed for [the Fifth Third] business accounts" as of July 2023. Despite having "the info [she] needed," Bui failed to note or object to the $7,000 payment, supporting an inference that she knew about it and had given consent. (Tr. Exs. 14, 15, 33, 38.)

16. In July 2023, Bui and Phan agreed to sell two of Golden Rooster's rental properties, after which Phan would buy Bui's membership interest. Closings for these properties occurred in September and October 2023. (*See* Tr. Ex. 37.)

17. Also in July 2023, Bui asked Phan to provide access to Golden Rooster's Venmo, Baselane, Bank of America, and other financial accounts. In response, Phan explained which accounts received rent payments from which tenants but did not divulge online credentials for any account. Phan also stated that she used her "personal log in" to access the Bank of America account and that, as a result, Bui would "have to set up [her] own log in for" that account. (*See* Tr. Exs. 14, 15.)

18. In a lengthy email dated 23 August 2023, Bui told Phan that "[I] am declaring war against you." Citing Phan's infidelity, Bui pledged "no forgiveness" and to "battle until one of us falls or both of us fall." According to Bui, "I am willing to spend money to bring you down," and "I can totally afford to spend everything I have to making sure you have nothing left." She added that "You will fight to keep what you have . . . and I will fight to prevent you from keeping it." (Tr. Ex. 31.)

19. Just two days after "declaring war," Bui sent another email urging Phan to "engage a real estate attorney to draft up a buy-out agreement" for Bui's interest in Golden Rooster. (Tr. Ex. 16.)

20. On 16 September 2023, Phan contacted attorney Jason Norman "to solicit [his] legal service . . . in reviewing and drafting up a partnership buyout agreement with the goal of not having [Bui] come after the business or me personally after this buyout." (Tr. Ex. 26.)

21. In a response on 25 September 2023, Norman stated that he could "work up something for" Phan. (Tr. Ex. 26.)

22. On 26 September 2023, Bui wrote to Phan, complaining that "I have neither a draft of the buy out agreement to review or you indicating a timeline whatsoever." Phan replied the same day, stating "I'm having my attorney review the legal aspects of drafting this up." (Tr. Ex. 16.)

23. Over the next week or so, Bui and Phan exchanged a series of emails concerning Golden Rooster's accounts, the status of the buyout agreement, and a tentative buyout amount. Bui expressed frustration with the pace of events and threatened litigation. Phan defended her reliance "on other professionals (like my attorney)" and asked Bui to "refrain from sending further threatening emails while I try to get this worked out." (Tr. Ex. 16.)

24. By early October 2023, Bui and Phan had jointly decided to sell Golden Rooster's remaining property, referred to as the Spring Street property. (*See* Tr. Ex. 17.)

25. On 10 and 11 October 2023, Bui and Phan again exchanged emails about access to Golden Rooster's accounts. Phan stated, "You said you needed to audit the books before signing off on the split. . . . Are you done?" Bui responded that "you are the main person with the login credentials," making the audit difficult to complete. Phan then provided balances for certain accounts and stated "[n]ot sure why you can't set up a log in" with Bank of America. Phan also asked Bui to confirm that she could access the company's Fifth Third and Skyla accounts, but Bui did not respond. (Tr. Ex. 17.)

26. On 20 October 2023, Norman informed Bui that "Ms. Phan has retained my firm's services to assist with negotiating a buyout agreement for Golden Rooster, LLC to purchase your interest in the company." In the same communication, Norman conveyed a buyout proposal. (Tr. Ex. 3.)

27. On 30 October 2023, Bui responded that the proposal was deficient because she was owed an additional $68,000 "for those services that I rendered for the Company during 2019-current." Bui also asked Norman whether "your legal services were retained on behalf of the company" or whether Phan "retained your services as an individual." (Tr. Ex. 4.)

28. On 3 November 2023, Norman told Bui that her $68,000 claim lacked support. In response to Bui's question about the scope of his representation, he stated that "I represent Ms. Phan's interest in the business, which by the nature of this transaction, means that I also represent the business since you are withdrawing as the only other member." (Tr. Ex. 4.)

29.     On 6 November 2023, Bui asked Phan and Norman to notify her in advance about future withdrawals or transfers from Golden Rooster's accounts. (Tr. Exs. 19, 20.)

30.     Around this time, Bui retained attorney Bo Caudill. On 14 November 2023, Caudill instructed Norman "not to engage in any further representation or legal services on behalf of" Golden Rooster. Caudill stated that Bui, as "a co-managing member . . . with coequal authority," had not approved Norman's representation of the company. (Tr. Ex. 5.)

31.     Upon receiving this letter, Norman advised Phan to retain him to represent Golden Rooster. According to Norman, "[t]he operating agreement allows any member to bind the company to a contract, and I'm afraid if we don't do it first, her attorney may get wise and try to take over the business' legal representation himself." (Tr. Ex. 34.)

32.     On 17 November 2023, Phan signed an engagement letter purporting to retain Norman and his firm, Norman Legal, PLLC, to represent Golden Rooster. Bui did not know about or give consent to the engagement. (Tr. Ex. 7.)

33.     After Phan signed the engagement letter, Norman told Caudill that "Ms. Phan has decided to officially engage my firm to represent Golden Rooster . . . ." Norman went on to say, "If you'll review paragraph 18 of the operating agreement for the LLC, you'll find that any member has the authority to bind the company in a contract, so this action is well within her rights." (Tr. Ex. 6.)

34.     The parties dispute whether Phan believed in good faith that the operating agreement allowed her to retain Norman to represent Golden Rooster.  The weight of the evidence shows that Bui urged Phan to retain a lawyer to assist with the buyout agreement and that, as a result, Phan retained Norman in her individual capacity in September 2023.  As the contemporaneous documents make clear, Norman later advised Phan to retain him to represent the company and assured her that the operating agreement gave her the authority to do so unilaterally.  The evidence does not suggest that Phan sought Norman's counsel dishonestly or withheld information from him that would have been relevant to his advice.  The Court finds that Phan followed Norman's advice and, based on his advice, believed in good faith that she was complying with the operating agreement.  (*See* Tr. Ex. 34.)

35.     On 1 December 2023, Norman advised Phan that she would "need to either remove [Bui's] access from the business accounts, or move the funds to different accounts where [Bui] is not a signatory."  Norman "advise[d] doing this" in connection with sending Bui a notice of involuntary withdrawal from membership in Golden Rooster "so [Bui] won't have any opportunity to seize company funds."  (Tr. Ex. 21.)

36.     On 13 December 2023, Phan sought additional guidance from Norman related to his advice to move Golden Rooster's funds.  Phan noted that the proceeds from the forthcoming sale of the Spring Street property would reside in the Bank of America "account where [Bui] has access."  Phan asked, "Would it be against the legal operating agreement for me to . . . set up a business account with only myself having access?"  (Tr. Ex. 21.)

37. Norman replied, "There's nothing that prohibits that type of transfer in the operating agreement, for either of you. Be quick." (Tr. Ex. 21.)

38. On 22 December 2023, closing for the Spring Street property occurred. (Stip. ¶ (h).)

39. That same day, without Bui's knowledge or approval, Phan wired $250,000 (about half the sale proceeds) from Golden Rooster's Bank of America account to a new account with First National Bank of Pennsylvania. (*See* Tr. Exs. 8, 27.)

40. On 2 January 2024, Caudill emailed Norman to demand that Phan return the $250,000 to the Bank of America account or give Bui online access to the new account. (*See* Tr. Ex. 8.)

41. Norman refused, stating that "Ms. Phan is well within her rights under the operating agreement to deposit business funds into an account in the name of the Business without requiring Ms. Bui's consent." (Tr. Ex. 8.)

42. The parties dispute whether Phan believed in good faith that the operating agreement allowed her to open the First National Bank account and transfer funds to it without giving Bui access. As shown in contemporaneous documents, Norman advised Phan to terminate Bui's access to Golden Rooster's accounts. Phan specifically asked Norman whether the operating agreement allowed her to move some of the proceeds from the sale of the Spring Street property to an account that Bui could not access. Norman advised her unequivocally that the operating agreement gave her authority to do so and urged her to act quickly. Again, the evidence does not suggest that Phan sought Norman's counsel dishonestly or

withheld information from him that would have been relevant to his advice. The Court finds that Phan followed Norman's advice and, based on his advice, believed in good faith that she was complying with the operating agreement. (*See* Tr. Exs. 8, 21.)

43. Currently, Golden Rooster's only assets comprise cash accounts, and it has not bought, sold, or managed any real estate since 22 December 2023. (Stip. ¶¶ (h), (i).)

44. On 11 January 2024, Bui began this lawsuit. (*See* ECF No. 2.)

45. On 11 April 2024, the Court entered a consent order on Bui's motion for preliminary injunction. This consent order required Phan to give Bui login information for Golden Rooster's accounts, barred Bui and Phan from transferring funds from these accounts without the other's consent, and prohibited Golden Rooster from paying for any services provided by Norman. (ECF No. 43.)

46. On 28 June 2024, the Court entered a consent order on Bui's motion to disqualify Norman as counsel in the litigation. This consent order deemed Norman to have withdrawn from his representation of Golden Rooster and struck all "papers, including pleadings, motions, and briefs that Norman purported to file in [the] action on behalf of Golden Rooster." (ECF No. 50.)

47. On 8 April 2025, the Court entered a consent order on Bui's second motion to disqualify Norman as counsel in the litigation. This consent order, in relevant part, allowed Norman to withdraw as counsel for Phan. (ECF No. 94.)

## II.
## CONCLUSIONS OF LAW[3]

48.     Bui asserts two claims for relief.  First, Bui seeks a declaratory judgment that Phan is no longer a member of Golden Rooster, either because Phan is subject to expulsion under paragraph 29 of the operating agreement or because Phan has involuntarily withdrawn under paragraph 60 of the operating agreement.  Second, Bui claims that Phan breached the operating agreement and seeks damages caused by the breach.

49.     The Declaratory Judgment Act broadly authorizes courts "to declare rights, status, and other legal relations, whether or not further relief is or could be claimed." N.C.G.S. § 1-253.   This includes "a declaration of rights, status, or other legal relations" under a contract.  *Id.* § 1-254.

50.     "The elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of that contract."  *Poor v. Hill*, 138 N.C. App. 19, 26 (2000).

51.     Bui, as the plaintiff, has the burden to prove her claims by a preponderance of the evidence.  *See, e.g.*, *Chase Dev. Group v. Fisher, Clinard & Cornwell, PLLC*, 211 N.C. App. 295, 303 (2011); *Braun v. Glade Valley School, Inc.*, 77 N.C. App. 83, 88–89 (1985).

---

[3] Any finding of fact that is more accurately labeled a conclusion of law is incorporated by reference into the Court's conclusions of law.  Likewise, any conclusion of law more accurately labeled as a finding of fact should be deemed as such.

52. "It is the policy" of North Carolina "to give the maximum effect to the principle of freedom of contract and the enforceability of operating agreements." N.C.G.S. § 57D-10-01(c).

53. The object of contract interpretation is to ascertain the parties' intent at the time the contract was made. *See, e.g.*, *Lane v. Scarborough*, 284 N.C. 407, 409–10 (1973).

54. If the contract does not define a term, then "non-technical words are to be given their meaning in ordinary speech, unless the context clearly indicates another meaning was intended." *Singleton v. Haywood Elec. Membership Corp.*, 357 N.C. 623, 629 (2003) (quoting *Gaston Cnty. Dyeing Mach. Co. v. Northfield Ins. Co.*, 351 N.C. 293, 299 (2000)).

55. "Individual clauses in an agreement and particular words must be considered in connection with the rest of the agreement, and all parts of the writing, and every word in it, will, if possible, be given effect." *Robbins v. C.W. Myers Trading Post, Inc.*, 253 N.C. 474, 477 (1960) (citation and quotation marks omitted).

56. "A contract that is plain and unambiguous on its face will be interpreted by the court as a matter of law." *Schenkel & Schutz, Inc. v. Hermon F. Fox & Assocs., P.C.*, 362 N.C. 269, 273 (2008).

57. The operating agreement's limitation-of-liability clause is unambiguous. The plain language of the clause makes clear that Bui and Phan broadly intended to limit their liability to one another, reserving liability for only those circumstances in which one or the other had ceased to act in good faith. Thus, the members "will not

be liable to" each other "for any act or omission believed in good faith to be within the scope of authority conferred or implied by" the agreement. Rather, a member "will be liable only for . . . acts and omissions involving intentional wrongdoing." (Op. Agrmt. ¶ 62.)

58. The operating agreement's expulsion and involuntary withdrawal provisions must be read in connection with this limitation-of-liability clause. For example, to extinguish membership following "any act in contravention of" the operating agreement (as stated in paragraphs 55 and 60) would conflict with the members' bargain to absolve "any act or omission believed in good faith to be within the scope of authority conferred or implied by" the agreement (as stated in paragraph 62).

59. Read as a whole, the operating agreement does not permit termination of membership, either through expulsion or involuntary withdrawal, for acts or omissions that the member believed in good faith to be within the scope of authority conferred or implied by the operating agreement.[4]

60. Evidence that a person sought and followed the advice of counsel may show the presence of good faith and the absence of bad faith or intentional wrongdoing. *See, e.g., Bryson v. Sullivan*, 330 N.C. 644, 662 (1992) (affirming trial court's finding, under Rule 11, that parties acted in good faith and in reliance on advice of counsel); *see also Brinckeroff v. Enbridge Energy Co.*, 159 A.3d 242, 260 (Del. 2017) (discussing

---

[4] To be clear, the operating agreement does not inhibit the parties from resolving good-faith differences concerning its meaning short of imposing liability, such as by referring the matter to a third-party neutral or asking a court to declare the contract's meaning.

contract provision in partnership agreement concerning consultation with counsel as indicia of good faith).

61.    Bui asserts that Phan is liable for breach and subject to expulsion or involuntary withdrawal for four reasons: (1) Phan's withdrawal of $7,000 from Golden Rooster's Fifth Third Bank account in April 2023; (2) Phan's failure to provide credentials for online access to company accounts; (3) Phan's unilateral retention of Norman to represent Golden Rooster; and (4) Phan's unilateral transfer of $250,000 to an account that Bui could not access.  The Court will address each in turn.

62.    **April 2023 Withdrawal.**  Bui claims that Phan's $7,000 withdrawal in April 2023 violated paragraph 8 of the operating agreement, which states that "[e]ach member will receive an equal share of any Distribution."  (Op. Agrmt. ¶ 8.)

63.    The Court has found that Bui knew about and gave consent for this withdrawal.  Because the members unanimously approved the withdrawal, no breach of paragraph 8 occurred.  Moreover, even if a unanimously approved withdrawal could be considered a breach, the evidence does not support a finding that Phan engaged in intentional wrongdoing.  Rather, the withdrawal was an "act or omission believed in good faith to be within the scope of authority conferred or implied by" the agreement, thus precluding liability under the limitation-of-liability clause.  (Op. Agrmt. ¶ 62.)

64.    The Court concludes that Bui has not shown by a preponderance of the evidence that Phan breached paragraph 8 of the operating agreement by withdrawing $7,000 from Golden Rooster's Fifth Third Bank account in April 2023.  Phan is not

liable for breach of contract or subject to expulsion or involuntary withdrawal on this ground.

65. **Failure to Provide Account Access.** Bui claims that Phan's failure to provide the credentials needed for online access to Golden Rooster's accounts breached paragraph 45 of the operating agreement. This paragraph states that "[e]ach Member has the right to demand, within a reasonable period of time, a copy of" various company records. (Op. Agrmt. ¶ 45.)

66. The operating agreement does not impose an obligation on Phan, individually, to maintain and provide access to company records. Rather, these obligations are Golden Rooster's. In other words, the proper defendant for an alleged breach of paragraph 45 is Golden Rooster, not Phan. *Cf. Elhulu v. Alshalabi*, 2021 NCBC LEXIS 95, at *5–6 (N.C. Super. Ct. Oct. 19, 2021) (dismissing statutory inspection claim asserted against LLC manager).

67. In any event, even if Phan had an individual contractual obligation to provide access to the company's online accounts, the evidence does not support a finding that she engaged in intentional wrongdoing. For example, Phan urged Bui to create her own log-in credentials with Bank of America, provided account balances and other financial information, and asked Bui to confirm that she had access to the Fifth Third and Skyla accounts (a question Bui did not answer). Phan's failures to convey additional information were not "acts and omissions involving intentional wrongdoing," thus precluding liability under the limitation-of-liability clause. (Op. Agrmt. ¶ 62.)

68. The Court concludes that Bui has not shown by a preponderance of the evidence that Phan breached paragraph 45 of the operating agreement. Phan is not liable for breach of contract or subject to expulsion or involuntary withdrawal on this ground.

69. **<u>Retaining Norman to Represent Golden Rooster.</u>** Bui claims that Phan's retention of Norman to serve as Golden Rooster's attorney breached the operating agreement provisions that vest equal managerial authority in the members and that prohibit the members from binding the company to a contract "outside the intended purpose of the Company." (Op. Agrmt. ¶¶ 8, 58.)

70. For purposes of this discussion, the Court assumes that Phan did not have the unilateral authority to retain Norman to represent Golden Rooster.

71. Even so, the Court has found that Norman advised Phan, a nonlawyer, to retain him to represent the company and assured her that paragraph 18 of the operating agreement—stating, "Any Member has the authority to bind the Company in contract"—gave her the authority to do so unilaterally. The Court has also found that Phan followed Norman's advice and believed in good faith that she was complying with the operating agreement. Taking into account all the circumstances, Phan's retention of Norman was an "act or omission believed in good faith to be within the scope of authority conferred or implied by" the agreement, thus precluding Phan's liability under the limitation-of-liability clause. (Op. Agrmt. ¶ 62.)

72. The Court concludes that Phan is not liable for breach of contract or subject to expulsion or involuntary withdrawal on this ground.

73. **December 2023 Transfer to First National Bank.** Bui claims that Phan's December 2023 transfer of $250,000 to an account with First National Bank breached paragraph 47 of the operating agreement, which states that "[t]he funds of the Company will be placed in such investments and banking accounts as will be designated by the Members." (Op. Agrmt. ¶ 47.)

74. For purposes of this discussion, the Court assumes that Phan did not have the unilateral authority to transfer $250,000 to the First National Bank account in December 2023.

75. Even so, the Court has found that Norman advised Phan, a nonlawyer, to terminate Bui's access to Golden Rooster's accounts. The Court has also found that Norman advised Phan that the operating agreement gave her authority to move the proceeds from the sale of the Spring Street property to an account that Bui could not access. And the Court has found that Phan followed Norman's advice and believed in good faith that she was complying with the operating agreement. Taking into account all the circumstances, Phan's transfer to the First National Bank account was an "act or omission believed in good faith to be within the scope of authority conferred or implied by" the agreement, thus precluding Phan's liability under the limitation-of-liability clause. (Op. Agrmt. ¶ 62.)

76. The Court concludes that Phan is not liable for breach of contract or subject to expulsion or involuntary withdrawal on this ground.

## CONCLUSION

77.     Based on these findings of fact and conclusions of law, the Court **ENTERS JUDGMENT** in favor of Phan on Bui's claims for breach of contract and declaratory judgment.  The Court **DECLARES** that Phan is a member of Golden Rooster and is not subject to expulsion or involuntary withdrawal.

78.     The parties have stipulated that if Bui does not prevail on her claim for declaratory judgment, then an order of dissolution under N.C.G.S. § 57D-6-02(2)(i) is proper.  No later than 6 February 2026, the parties shall confer and submit a status report (jointly, if at all possible) specifying their positions on the appropriate process for dissolving and winding up Golden Rooster.


        **SO ORDERED**, this the 21st day of January, 2026.




                        /s/ Adam M. Conrad
                        Adam M. Conrad
                        Special Superior Court Judge
                         for Complex Business Cases